IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH T. KUBICKI,  on own          :
behalf and as a parent and          :
natural guardian on behalf of       :
minor, Joseph Kubicki               :

    AND                             :
                                    :
JOSEPH KUBICKI, a minor             :
        Plaintiffs             :
                                    :
    VS.                             :
                                    :
WHITEMARSH TOWNSHIP                  :

    AND
POLICE OFFICERS RICHARD STEMPLE,:       CIVIL ACTION
POLICE OFFICER RICHARD ZADROGA, :
AND POLICE OFFICER JEFFERY NOWAK:
                                    :
        Defendants        :       NO. 04-5780

## MEMORANDUM AND ORDER

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

        Plaintiffs[1] filed the instant lawsuit on December 14, 2004, pursuant to 42 U.S.C. § 1983 alleging violations of civil rights as a result of an incident with several officers of the Whitemarsh Township Police Department on December 24, 2002. Specifically, plaintiffs allege that Officers Richard Zadroga, Richard Stemple, and Jeffrey Nowak violated their Fourth Amendment

---

[1]In this memorandum, plaintiff, Joseph Kubicki, Sr. will be referred to as "plaintiff." Plaintiff, Joseph Kubicki, Jr. will be referred to as "Joseph, Jr."

right to be free from unreasonable seizures when the police illegally entered plaintiffs' home without a warrant or exigent circumstances and used excessive force in the course of detaining and searching plaintiff.  Section 1983 provides a vehicle for imposing liability against anyone, who under color of state law, deprives a person of "any rights, privileges, or immunities secured by Constitution and laws."  42 U.S.C. § 1983.

Defendants have filed a motion for summary judgment on all remaining counts in the complaint.[2]  For the reasons which follow, said motion will be granted.[3]

## I.  FACTUAL BACKGROUND

On December 24, 2002, plaintiff was at his residence at 402 Roberts Avenue along with plaintiff's son Joseph Jr., age 12, and plaintiff's two-year-old daughter.  This residence is a two-story house that had been divided into an upstairs apartment and a downstairs apartment.  Plaintiff resided in the upstairs apartment which consisted of a living room, kitchen, two bedrooms, and a bathroom.[4]  This upstairs apartment was entered by an exterior door

---

[2]Plaintiffs earlier withdrew all claims against Whitemarsh Township.

[3]This matter was referred by the Honorable Petrese B. Tucker, and the parties filed consents pursuant Fed.R.Civ.P. 73.

[4]The children's grandmother, Maryann Leahy, and her boyfriend, Alex Conshick, lived in the downstairs apartment.

located on the ground floor that opened up to an interior hallway which led to the second floor. The facts according to the plaintiff are as follows: Plaintiff asserts that he along with his two children were lying on the bed in his bedroom watching television. Plaintiff did maintenance work at rental properties owned by his brother-in-law and was, at this time, talking on a cell phone with a tenant who had an electrical problem (Kubicki, Dep. at 46,48, 80-81). Plaintiff noticed a light in the living room area of the apartment, and believed the light to be his brother-in-law "playing around." Plaintiff asked Joseph Jr. to investigate (Kubicki, Dep. at 53).

Joseph Jr. went into the hallway and discovered that the light came from a flashlight held by a police officer. Joseph Jr. ran back into the bedroom and told his father that it was the police. Plaintiff got off the bed and headed into the hallway while still speaking on the phone. As plaintiff approached the officers, the officers were screaming "[W]here is she?." Assuming the officers meant Mary Leary[5] (the mother of plaintiff's two children), plaintiff said that she was not there and was in prison at the time (Kubicki, Dep. at 53-56).

The first officer that plaintiff encountered was Officer Zadroga. Officer Zadroga told plaintiff to hang up the phone.

---

[5]Mary Leahy is the daughter of Maryann Leahy, and at one time, resided on the second floor with the plaintiff and their children.

3

Plaintiff complied.  Plaintiff then told the officers that she was not there and he had proof (letters from the prison).  Plaintiff walked over a couple of steps to get the letters near his computer when Officer Zadroga told plaintiff to put his hands behind his head (Kubicki, Dep. at 56-57).

In response to Officer Zadroga's instruction, plaintiff was confused and put his hands behind his back.  Officer Zadroga grabbed plaintiff's left wrist and put it up behind plaintiff's head.  Plaintiff felt a "pop" in his left shoulder, and "screamed" out in pain (Kubicki, Dep. at 59-63).  Plaintiff was then patted down.  Plaintiff contends that he then asked about his daughter, and when plaintiff turned toward the bathroom where his daughter was, Officer Zadroga grabbed plaintiff by the injured left arm and pulled plaintiff back.  While this was happening, Officers Stemple and Nowak searched the house.  Shortly thereafter, the officers rushed out of the house and went to the downstairs apartment (Kubicki, Dep. at 68,71,85).  Plaintiff asserts that three days later he went to the hospital due to shoulder pain, and later went to a specialist.  Plaintiff had an MRI and was diagnosed with a partial tear of the rotator cuff (Kubicki, Dep. At 90, 95).

Defendants, Officers Zadroga, Stemple, and Nowak, offer a different version of the incident.  Officers Zadroga and Stemple testified at their depositions that they received a radio call for a domestic dispute at 402 Roberts Avenue.  They arrived almost

4

simultaneously, and upon exiting their vehicles, both officers heard a male voice yelling and cursing.  This voice came from the second floor.  Neither officer knew that this residence consisted of two apartments, and went directly to an exterior door that led to the second floor (Zadroga, Dep. at 42-62, Stemple, Dep. At 24-43).

The door was unlocked and, at this time, Officer Nowak arrived.  Officer Nowak also heard yelling upstairs.  The officers waited at the bottom of the stairs and when no one responded to their repeated knocks and announcements of "Police," all three officers decided to go up the stairs (Zadroga, Dep. at 58-64, Stemple, Dep. at 38-46, Nowak, Dep. at 12-13).

Officer Zadroga stated that he walked to the top of the stairs and saw plaintiff partially obstructed in a kitchen area talking on a telephone.  Officer Zadroga asked plaintiff twice to come over to him.  Officer Zadroga then asked plaintiff where Mary (referring to Mary Leahy) was.  When the officer didn't get any information, Officer Zadroga instructed plaintiff to put his hands behind his head so the officer could pat plaintiff down because the officer was concerned with everyone's safety.  Officer Zadroga claims that plaintiff complied with this request and put his hands behind his head. (Zadroga, Dep. at 72-108).

Officer Stemple testified in his deposition that he followed Officer Zadroga up the stairs to the second floor.  Once

there, Officer Stemple noticed that plaintiff was agitated.  This officer then went to search the rooms for other people, and found plaintiff's children in a bedroom watching television.  Officer Stemple stated that the children did not appear upset and that Joseph Jr. told the officer that no one had been fighting.  The officers were then informed by radio that the domestic disturbance was actually on the first floor, and they left the second floor immediately  (Stemple, Dep. at 55-76).

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986); Williams v. Borough of West Chester, 891 F.2d 458, 463-464 (3d Cir. 1989).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For there to be a "genuine" issue, a reasonable factfinder must be able to return a verdict (or render a decision) in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh

the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable  to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party.  See Anderson, 477 U.S. at 255.

Once the movant has carried his initial burden, Rule 56(e) shifts the burden to the nonmoving party as follows:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. FED.R.CIV. P. 56(e).

However, to raise a genuine issue of material fact "'the [summary judgment] opponent need not match, item for item, each piece of evidence proferred by the movant,' but simply must exceed

7

the 'mere scintilla' standard." <u>Petruzzi's IGA Supermarkets, Inc.</u> <u>v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224, 1230 (3d Cir.), <u>cert.</u> <u>denied</u>, 510 U.S. 994 (1993).  Summary judgment may be granted only if, after viewing all evidence in the light most favorable to the non-movant, no jury could decide in that party's favor.  <u>Tigg Corp.</u>, 822 F.2d at 361.

### III. QUALIFIED IMMUNITY STANDARD

Defendants, Officers Zadroga, Stemple, and Nowak, assert that plaintiffs' claim of illegal entry and excessive force under the Fourth and Fourteen Amendments pursuant to 42 U.S.C. § 1983 should be dismissed with prejudice because the officers have qualified immunity.

Qualified immunity is an immunity from suit and not a mere defense to liability.  As a general rule, a qualified immunity issue should be determined prior to trial as the purpose of qualified immunity to is protect officials and public employees from undergoing the burdens of litigation.  <u>Mitchell v. Forsythe</u>, 472 U.S. 511 (1985).

The Supreme Court in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982) articulated the legal standard for analyzing a qualified immunity claim: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established

8

statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818.  A court must deny the claim if the law is clearly established, "since a reasonably competent public official should know the law governing his conduct" unless he can either demonstrate extraordinary circumstances or that he "neither knew nor should have known" about the legal right in question.  Id. at 818-19.

Anderson v. Creighton, 483 U.S. 635 (1987), clarified the Harlow standard.  The Court held that whether a government official could claim qualified immunity for violating a constitutional right depended on the "objective legal reasonableness" of the action.  Id. at 639.  Thus, government officials are shielded from civil liability not based on their subjective understanding of the law, but only "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Id.; see also Gruenke v. Seip, 225 F.3d 290 (3d. Cir. 2000).

Anderson also more clearly defined the meaning of a "clearly established right": "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be

9

apparent." <u>Anderson</u>, 483 U.S. at 639; <u>Gruenke</u>, 225 F.3d at 299.

"However, a good faith belief in the legality of the conduct is not sufficient.  Such belief must be objectively reasonable.  To determine reasonableness, a reviewing court must ask 'whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed.'" <u>Parkhurst v. Trapp</u>, 77 F.3d 707, 712 (3d Cir. 1996), quoting <u>Anderson</u>, 483 U.S. at 641.  "The objective facts control a decision on summary judgment, regardless of allegations of intent." <u>Id</u>.

Thus, the question before us in determining whether Officers Zadroga, Stemple, and Nowak are entitled to qualified immunity with regard to the warrantless entry is whether their conduct was "objectively reasonable" in light of clearly established law and the information that they possessed at the time of the entry.  In addition, the excessive force claim will also be considered under the same objective reasonableness standard.

The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." <u>Harlow</u>, 457 U.S. at 818; <u>Mitchell</u>, 483 U.S at 526.

## A. ILLEGAL ENTRY

"The right of a man to retreat into his own home and there be free from unreasonable government intrusion stands at the very

core of the Fourth Amendment." <u>Kyllo v. United States</u>, 533 U.S. 27, 31 (2001) (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961)).

A warrantless entry into a home is considered a presumptively unreasonable search under the Fourth Amendment. <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980). However, certain circumstances can excuse the warrant requirement. Among these, is exigent circumstances. <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749 (1984). Such exigent circumstances are typically found where there is a risk of destruction of evidence or escape of a defendant, or where there is a threat of physical harm to a police officer or an innocent individual. <u>United States v. Velazquez</u>, 626 F.2d 314, 317 (3d Cir. 1980).

"The burden of establishing exigent circumstances lies with the government, and where officers assert exigency due to their belief that a person is in danger, the officers must establish that they reasonably believed that the person for whom they were concerned was in *imminent* danger." <u>Parkhurst</u>, 77 F.3d at 711 (emphasis added), <u>Tillman v. Alonso</u>, 2005 WL 3488927 (E.D. Pa.).

In the instant matter, we find that the three officers, Zadroga, Stemple, and Nowak, "reasonably believed" that a person or person(s) was in "imminent" danger, and that "exigent circumstances" existed in order to excuse their warrantless entry into the home of the plaintiffs. Additionally, we find an entitlement to qualified

immunity since the officers' conduct was "objectively reasonable" under the circumstances.  <u>Parkhurst</u>, 77 F.3d at 712.

We will first address plaintiffs' response to the summary judgment motion citing case law supporting a finding of illegal entry here, and arguing material facts which would preclude summary judgment.  Plaintiffs contend that it was unreasonable for the officers to believe that the domestic disturbance was on the second floor since Officers Stemple and Nowak testified that the radio call did not specify who the complainant was (Stemple, Dep. at 25; Nowak, Dep. at 19), and Officer Zadroga remembered the complainant being Maryann Leahy who he knew lived on the first floor.[6]  Plaintiffs claim that a jury could infer that the officers knew that the premises had separate upstairs and downstairs apartments and that Maryann Leahy, the complainant, lived on the first floor.

We do not find this to be material fact in dispute precluding summary judgment.  There is no question there was a domestic incident at 402 Roberts Avenue.  Defendants do not dispute that the officers' entry into the second floor was a misinterpretation of the actual circumstances occurring.  There is,

---

[6]Officer Zadroga testified that he had responded to this residence on one prior occasion when he was with the Montgomery County Sheriff's Department.  That one occasion was a dispute between Mary Leahy (resident of the second floor) with Alex Conshick (boyfriend of Mary's mother and first floor residence). He, however, only spent a few minutes there because he had to leave for a family emergency. (Zadroga, Dep. at 30, 32).

however, no indication in the deposition testimony of any of the three officers, that the officers knew the disturbance was actually on the first floor.[7]  The relevant issue is whether the officers reasonably believed that "exigent" circumstances existed in order to enter the second floor premises without a warrant.

Here, the testimony of the three officers establishes a reasonable belief that a person(s) was in "imminent danger." Officer Zadroga testified that he was backing up Officer Stemple who arrived at the residence at approximately the same time.  As Officer Zadroga and Officer Stemple approached the premises, Officer Zadroga could hear a "male voice agitated, loud, coming from the residence." Officer Zadroga could not make out what was being said, but heard a "loud voice that sounded agitated" that was coming from the second floor[8] (Zadroga, Dep. at 45, 56).  Officer Zadroga knocked on the

---

[7]Officer Zadroga testified that he could not recall if he knew that the property was a duplex having separate units upstairs and downstairs.  He stated that "it stands as a single building.  It looks like a house from the outside." (Zadroga, Dep. at 41-42).  Officer Stemple testified that he never had any prior contact with any of the plaintiffs and had never been inside the 402 Roberts Avenue residence (Stemple, Dep. at 23).

[8]It is additionally claimed that there is an issue of material fact concerning the volume of plaintiff's voice while he was on his cell phone that can only be resolved by a jury.  We disagree.

Plaintiff testified that he was on the phone, but was not yelling or screaming (Kubicki, Dep. at 80-81).  Joseph Jr. testified that his dad was on the phone, but was not loud.  "[I]t was actually quiet" (Kubicki, Jr., Dep. at 22).  However, as discussed above, it is undisputed that the only noise coming from 402 Roberts Avenue when the officers arrived was from the second

door loudly, and after no response, he knocked hard again.  Still, no response was received, so Officer Zadroga pushed the unlocked door open and yelled "Police."  Officer Zadroga still received no response.  The officer again yelled "Police."  With no response once more, Officer Zadroga knocked louder and yelled louder, "Police, police, somebody come to the top of the steps." (Zadroga, Dep. at 59-60).  When asked, "[W]hat threat was there when you were standing downstairs,?" Officer Zadroga summed up why he entered the premises:

> "[W]ell we got a call for a domestic [disturbance] that was in progress.  When we arrived on location we hear a male voice agitated and loud.  We go to the front door. We knock.  I knock loudly.  Get no response.  Knock again loudly announcing that the police are here.  Get no response.  And knock probably a third time and – I don't know could have been more times, again announcing that the police are downstairs, somebody come to the top of the steps . . .  I was just going to say, so those circumstances raised safety issues."  (Zadroga, Dep at 61).

Officer Zadroga added that after Sgt. Nowak arrived at the door, and after announcing themselves again, the three officers collectively came to a decision to enter the premises (Zadroga, Dep. at 64).

Officer Stemple testified that he and Officer Zadroga had arrived simultaneously.   As Officer Stemple approached the residence, he heard "yelling" [and] "[C]ursing. Somebody sounded

_____

floor.  In fact, Joseph Jr. testified that he didn't hear any noise (yelling, screaming, or banging) coming from the downstairs residence that night before or after the police arrived (Kubicki, Jr., Dep. at 21).

like they were very angry" (Stemple, Dep. at 23, 31).  Officer
Stemple recognized a man's voice and the man was cursing.  "I heard
the F bomb a couple of times."  "Excessive cursing and yelling."
"The cursing and yelling were just continuous" and one-sided with
no response coming back (Stemple, Dep. at 35-36).  Officer Stemple
stated further that he and Officer Zadroga walked to a door on the
side of the house, and again they heard "yelling, and somebody was
very agitated."  Officer Stemple and Officer Zadroga went to the
entrance which had a screen door and a solid door that were open.
Officer Stemple looked through and saw the entrance to a flight of
stairs.  Officer Stemple and Officer Zadroga opened the door and
Officer Zadroga yelled repeatedly , 4-5 times, "Police department
come to the top of the stairs." (Stemple, Dep. at 39, 42-43).
Officer Nowak had arrived during Officer Zadroga's announcements,
and all three officers believed there was a problem upstairs and
that they needed to go up (Stemple, Dep. at 45-46).

        Officer Nowak testified that he arrived at the residence
after Officers Zadroga and Stemple.  When Officer Nowak approached
the door, he also could hear a "loud agitated voice" that was coming
from the second floor.  Officer Nowak heard only one voice and
described it as "yelling or screaming" (Nowak, Dep. at 10, 12).
Officer Nowak explained, "[T]hat coupled with the domestic
[disturbance] that we had responded to and the fact that we were
getting no response to our announcement, led me to believe that

there may be somebody in danger upstairs, and it was incumbent upon us to make an entry." Officer Nowak noted that it was a collective decision to enter (Nowak, Dep. at 10-13).

From the above testimony of the officers, we find that all three officers reasonably believed that a victim could have been in "imminent" danger constituting "exigent" circumstances justifying the warrantless entry. The officers were called to a domestic disturbance at a residence, and upon arrival, all heard an "angry," "agitated," and "loud" male voice coming from the second floor. Officer Zadroga announced their presence repeatedly and asked for someone to come to the top of the stairs. "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting all but the plainly incompetent or those who knowingly violate the law." Malley v. Biggs, 475 U.S. 335, 341 (1986). This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued. Davis v. Scherer, 468 U.S. 183, 196.

Accordingly, we find that the defendants' actions were "objectively reasonable" "in light of clearly established law and the information that [they] possessed" at the given time. Anderson, 483 at 641. On this finding, the officers are entitled to entitled to qualified immunity as to this cause of action.[9]

---

[9] The evidence also indicates that the entry was minimally intrusive. The testimony from the officers demonstrates that they entered plaintiffs' residence and only stayed as long as it

**B. EXCESSIVE FORCE**

The Supreme Court has firmly established the "basic principal of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Groh v. Ramirez, 540 U.S. 551, 559 (2003); Payton v. New York, 445 U.S. 573, 586 (1980).

A police officer who has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest may make a reasonable search for weapons, even though he is not absolutely certain that an individual is armed; reasonableness of action depends not on his inchoate and unparticularized suspicion or hunch but on specific reasonable inferences which he is entitled to draw from facts in light of his experience. Terry v. Ohio, 392 U.S. 1, 27 (1968), Beck

---

was necessary to find out that they were in the wrong premises. Officer Zadroga testified that as soon as he heard over the radio from Officer Swan that the "domestic" was downstairs, he "jetted downstairs." He estimated that the total time spent, from the time the officers arrived at the residence to the time they went downstairs, was "under five minutes" (Zadroga, Dep. at 93-94). Officers Stemple and Nowak also testified that they left the premises as soon as the call came from Officer Swan that the disturbance was in the downstairs apartment (Stemple, Dep. at 62, Nowak, Dep. at 57-58). Furthermore, plaintiffs do not claim that the officers were in their residence for an extended period of time. In fact, both plaintiff and Joseph Jr. agreed that the three officers quickly exited the premises. Joseph Sr. stated that he believed the officers made a mistake in entering the premises because "how they hightailed it out" (Kubicki, Jr., Dep. at 86). Of course, there is a question of whether Officer Zadroga used excessive force in "patting down" the plaintiff, and this issue will be discussed infra.

v. State of Ohio, 379 U.S. 89, 91 (1964).

The sole justification of the search is the "protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry at 29.

The three officers testified at their depositions as to the events that transpired after they entered the premises. Their versions are as follows: Officer Zadroga testified that he went up the stairs first with Officer Stemple behind him. Officer Zadroga did not have his weapon drawn. As Officer Zadroga went up the stairs, he could see half of the plaintiff standing in a kitchen/living area looking right at the officer with a telephone in his hand. The other half of plaintiff was blocked by a kitchen wall (Zadroga, Dep. at 64-72). Officer Zadroga advised plaintiff to get off the telephone and step out of the kitchen. When plaintiff did not comply, Officer Zadroga ordered plaintiff to come out of the kitchen a second time, and explained plaintiff that the police were there for a domestic call (Zadroga, Dep. at 70-73). Officer Zadroga then asked plaintiff where Mary [Leahy] was. When plaintiff did not provide any information to this question, Officer Zadroga became concerned "[B]ecause [she] could be a possible victim." Officer Zadroga stated that considering the "totality of the circumstances," he was concerned for the safety of anyone in the

building (Zadgora, Dep. at 75-76).

Officer Zadroga testified further that he told plaintiff to get out of the kitchen because "in the kitchen, there's weapons, there's knives, possible weapons that could be used against us." Officer Zadroga again asked plaintiff where Mary Leahy was and again he received  no answer (Zadgora, Dep. at 79).  Officer Zadroga stated:

> "[A]gain, due to all the circumstances at this point, feeling that something is – nothing is coming together. There's no explanation where Mary Leahy is or what happened.  So, I ask him at that point to turn around and place his hands behind his head."  "I needed to pat him down for my safety."  (Zadroga, Dep. at 79).

Officer Zadroga recalled that plaintiff complied with his request to turn around and put his hands behind his head, and that the only time he mentioned his shoulder was when he was asked to turn around.  Plaintiff put his arms back and said, "I have arthritis in my shoulder.  That's what he said."  My response was something like, "Okay, I just want to pat you down for weapons." Officer Zadroga added  that plaintiff didn't look uncomfortable and never made any noises indicating that he was in discomfort or pain. Officer Zadroga then told plaintiff to sit on the couch which plaintiff did (Zadroga, Dep. At 83-84, 106-108).  Officer Swan then arrived on location and advised the three officers over the radio that the domestic dispute was on the first floor (Zadroga, Dep. at 92-93).

Officer Stemple did not witness the pat-down.  He recalled

19

that neither he nor Officer Zadroga had weapons drawn when the officers went up the stairs, but there was concern that the officers encounter someone with a weapon.  As he followed Officer Zadroga up the stairs, Officer Stemple saw plaintiff on the telephone and plaintiff was "very agitated."  Officer Stemple indicated that the level of plaintiff's voice, the words plaintiff was using, and plaintiff's body language gave the officer this impression (Stemple, Dep. at 47, 50-52).  Officer Stemple, however, never saw any physical contact between plaintiff and Officer Zadroga since Officer Stemple was busy looking in the other rooms of the premises for other people.  Officer Stemple also indicated that he never heard plaintiff scream out in pain (Stemple, Dep. at 75, 85-86).

Officer Nowak also testified that when Officer Zadroga entered the upstairs apartment Zadroga's gun was not drawn.  Officer Nowak stated that Officer Zadroga told plaintiff to get off the phone which plaintiff eventually did.  Officer Nowak recalled "having him put his hands behind his head to pat him down" (Nowak, Dep. at 40-42).  Officer Nowak also recalled plaintiff mentioning that plaintiff had a bad shoulder.  Officer Nowak remembered Officer Nowak using the "hands-behind-the-head technique, to pat him down."  Officer Nowak saw Officer Zadroga grab the hands behind the head and begin a pat-down.  Officer Nowak didn't recall seeing plaintiff put his hands behind his back, and didn't recall plaintiff making any kind of noise indicating he was hurt (Nowak, Dep. at 46-48).

Plaintiff, Joseph, Jr. gave his recollection of what occurred after the officers entered his home.  Joseph, Jr. testified that when the police officer first encountered his father, the officer told his father to "put his f'ing hands on your head, or something."  In response to the question, "after your dad put his hands behind his back, what happened next?, Joseph Jr. stated that the officer "grabbed" his left arm "[A]nd twisted it.  He like twisted it back and put it behind his head like that."  Joseph Jr. explained further that "[H]e grabbed with one [hand], and I'm pretty sure that he like grabbed– he had another hand, too, like on his elbow, like forcing it up."  Joseph Jr. added that his father screamed in pain when the officer did this.  The officer then patted his father down and when his father went to move toward his daughter, thinking he was finished being frisked, the officer "grabbed his arm again and yanked it back" (Kubicki, Jr., Dep. at 23-30).

As is evident from the above testimony, there are differing accounts of how plaintiff was frisked, and the amount of force used.  Plaintiffs argue that these different versions of the pat-down constitute material facts that are dispute in this case. The defendants, however, readily concede that Officer Zadroga used some degree of force to attain plaintiff's compliance with his directive to put his hands behind his head.  Defendants assert that, under any version, the force used was not excessive.  In fact,

21

defendants concede, for purposes of this motion only, that they accept plaintiff's recollection of the incidence.  They contend that even considering the facts most favorable to the plaintiffs, excessive force has not been established.  We agree.

Plaintiff's recollection of the events in question is as follows: Plaintiff testified that he was on the phone with a tenant of his brother-in-law when the police came into the house.  As plaintiff was talking, he noticed a flashlight and then a black figure.  Plaintiff thought his brother-in-law was "playing around," so he sent his son to check it out.  Plaintiff's son came back and said it was the police.  Plaintiff then heard the officers yell "Police," but was confused as to why the police were there. Plaintiff stated that he walked toward the officers and the officers were screaming at him, "Where is she?"  Plaintiff thought the police were talking about the mother of his children (Mary Leahy) who was, at that time, in prison.  Plaintiff told the officers that she was not there.  Plaintiff also told the officers that he had letters that proved such.  Plaintiff walked over to get the letters and one of the officers stood right by his side (Kubicki, Dep. at 53-56).

Plaintiff stated that, at this point, an officer (Zadroga) told him to put his hands behind his head, but plaintiff got confused and put them behind his back.  When plaintiff did that, the officer "decided to put my left arm behind my head for me."  The officer "grabbed the wrist and placed – - took it and turned it, and

22

placed my hand so it was behind my head." When the officer did this, plaintiff stated that he "screamed" because he "hurt my shoulder bad" (Kubicki, Dep. at 57-59). Plaintiff explained further that the officer had "his other hand up on my shoulder here. And he grabbed this arm. And he took this arm and placed it. And he put it up behind my head" (Kubicki, Dep. At 60). Plaintiff added that plaintiff's hands were behind his head for about "24-25 seconds." Plaintiff then made a move toward his daughter in the other room and the officer grabbed his left arm again and spun him around (Kubicki, Dep. at 65, 88).[10]

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989).

Here, plaintiff's testimony of his pat-down or frisk simply does not establish excessive force under the objective standard of Graham. In fact, plaintiff acknowledged that Officer

---

[10]It is clear from this testimony that no excessive force claims can be established against Officers Stemple and Nowak. In addition, plaintiff conceded in their answer to the summary judgment motion that "Officers Stemple and Nowak cannot be held liable under a theory of excessive force" (Response to Summary Judgment Motion at 19).

Zadroga could have had a reasonable belief that plaintiff had access to a weapon in the kitchen area.  Plaintiff stated that, "[H]e [Zadgora] was like on my hip.  I guess he thought I could get a weapon" (Kubicki, Dep. at 54-56).

However, the most damaging evidence against the excessive force claim is actually from the plaintiff himself.  Plaintiff testified that when he mistakenly put his hands behind his back, Officer Zadroga "grabbed the wrist and *placed* – - *took* it and *turned* it, and *placed* my hand so it was behind my head." (Emphasis added).  Plaintiff didn't testify that Officer Zadroga yanked his hands up or forcibly shoved his hands up, but rather he twice used the word "placed" and also used the words "took" and "turned" which can hardly be deemed words describing excessive force.[11]

Moreover, "[T]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 at 397.  It would be easy in this case looking back to conclude that Officer Zadroga overreacted in frisking plaintiff because the officer was in the wrong premises, but as discussed earlier, Officer Zadroga and the other officers reasonably believed that "exigent circumstances" existed to justify the warrantless

---

[11]It can also be inferred from the testimony that plaintiff had a pre-existing shoulder condition and that any movement of his arms up behind his head, no matter how carefully performed, would have caused him pain and even injury.

entry.  Likewise, under <u>Graham</u>'s objective standard, Officer Zadroga was justified in being concerned for his safety and frisking the plaintiff.[12]

Accordingly, since the amount of force used by Officer Zadgora was reasonable from his perspective and even from plaintiff's testimony, the excessive force claim cannot survive a motion for summary judgment on the merits.  Further, since we find the officer's actions were "objectively reasonable" in light of the information possessed, the officer is also entitled to qualified immunity regarding this claim.  <u>Anderson</u>, 483 at 641.  We find that there are no material facts at issue here, and the facts amply support a qualified immunity grant.  Accordingly, summary judgement is awarded to the defendants on all remaining causes of action.

An appropriate order follows.

---

[12]Lastly, plaintiffs also have claims for bystander liability against Officers Stemple, and Nowak for allegedly standing by while excessive force was used.  The defendants, however, are also entitled to summary judgment on these claims since plaintiffs have failed to establish the use of excessive force in this case.